Herman Lee **WILEY**, Appellant,

v.

**The STATE of Oklahoma, Appellee.**

**No. F–75–606.**

Court of Criminal Appeals of Oklahoma.

June 21, 1976.

David N. O'Brien, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

The Appellant, Herman Lee Wiley, hereinafter- referred to as defendant was charged, tried before a jury and convicted of the crime of Murder in the Second Degree in the District Court of Oklahoma County, Case No. CRF–74–1881. Punishment was assessed at an indeterminate sentence of not less than ten (10) years nor more than life imprisonment under the direction and control of the Department of Corrections of the State of Oklahoma in accordance with 21 O.S.1973, § 701.4. From said judgment and sentence the defendant has perfected his timely appeal.

Briefly stated, the evidence adduced at trial is as follows, to-wit: Larry Don Foster testified that on the 5th day of June, 1974, at approximately 1:30 A.M. he and his brother, James Foster, went to Uncle Charley's Club in Oklahoma City where they encountered the defendant. Foster further stated that he observed the defendant grab his brother by the arm and his brother jerked free and hit the defendant. The defendant then reached for a gun and James Foster ran out the door with the defendant chasing and firing at him. The witness watched the defendant and James Foster during the chase and, once the defendant and James Foster rounded another corner of the building, heard two (2) further shots.

The State then called Leaster Kemp who testified that he had been at Uncle Charley's the night James Foster was shot. He stated he observed the defendant grab Foster by the arm and Foster turn and strike the defendant in the face. The defendant then drew a gun and began shooting. Kemp further testified that there had been another man shouting for the defendant to shoot Foster and that said individual also chased Foster and defendant out of the building. Kemp further testified as follows:

"Q. Who started shooting?

A. Wiley.

Q. This defendant right over here started shooting?

A. Uh-huh.

Q. Okay.

A. James ran. He was running down the side of the building and he was shooting and the other guy was still hollering kill him, shoot him.

Q. Where was this other guy now that was doing all that hollering?

A. He was following Wiley running behind him.

Q. Following behind this defendant here?

A. Uh-huh.

Q. Okay. Go ahead.

A. And after the second shot I began to run behind them and he shot—he was shooting and as he turned the building corner of the building and I heard another shot and I turned the corner and they had shot him and they was standing there looking at him."

On cross-examination, the witness stated that he saw the defendant fire four (4) shots and heard two (2) others. The defendant fired at least one (1) shot after Foster had turned the corner of the building.

The State then called Johann M. Kimbro, a police officer with the Oklahoma City school system, who testified that he was at the club during the early morning hours of June 5th and observed the victim, James Foster, run from the building and saw the defendant fire at least three (3) shots. He further stated that he then called police headquarters and subsequently approached the decedent's body and observed that Foster had been shot in the left shoulder with the bullet exiting over his right jugular vein. On cross-examination he stated that Foster was still on his feet and running when he entered the building to call police.

Oklahoma City Police Officer Jimmy Leon Mosley then testified that upon his arrival at the scene at approximately 2:00 A.M. he observed the body of the victim lying on the curb on the East side of the building. Oklahoma City Police Officer Bob Thompson then testified to essentially the same facts as Officer Mosley. He further stated that he was unable to find any spent bullets in the area near the deceased's body. Fred B. Gordan, Assistant Chief Medical Examiner for the State of Oklahoma, then testified that he conducted an autopsy and in his opinion Foster died as a result of a gunshot wound in the back. No bullet was recovered from the body. On cross-examination Gordan stated that he was unable to tell if the bullet wound had been caused by a .22 caliber or a .38 caliber projectile. The State then rested.

Defense witness Mac McGrew testified that the defendant was his brother and that he accompanied the defendant to Uncle Charley's on the evening of June 4th. At some point during the evening James Foster had an argument with one Ray Charles. As Foster was leaving the building after the altercation with Charles, Foster hit the defendant in the eye causing the defendant to fall. At this point Foster ran out the West door and the defendant pulled a gun and chased after him. McGrew stated that the defendant was holding one hand over his eye and shooting the pistol in the air. As the defendant chased Foster along the North side of the building, another individual exited the North door of the club and stepped between the defendant and Foster. He further stated that he heard three (3) shots fired after the three (3) men turned the Northeast corner of the building and headed South. When the witness turned the corner, he observed Foster lying face down on the pavement.

Loretta Dixon then testified that she was a cocktail waitress at Charley's on June 5th and had waited on the defendant, his brother, Ray Charles and the victim, James Foster. She further stated that she witnessed a disturbance between the parties and Ray Charles was in fact named William Washington.

Ervin Winesberry then testified that he had been seated at the table with the defendant and that he observed James Foster and William Washington arguing at the front entry of the club. Subsequently, as Foster was walking in front of the defendant, he swung and hit the defendant knocking him to the ground. Defendant pulled a gun and chased Foster out of the building. He further stated that as the defendant was chasing the deceased he observed Wil-

liam Washington come out of the North door of the building and enter the chase between the deceased and the defendant.

The defendant then took the stand to testify in his own behalf stating that on the night of the shooting he had gone to Uncle Charley's and had been seated at a table next to Foster's. Foster started talking rudely to other people at the defendant's table and the defendant stood up and placed his hand on Foster's shoulder, whereupon Foster turned and hit him in the eye. Defendant then pulled a pistol as Foster ran out the West door of the building. Defendant stated he fired his pistol into the air to scare Foster and thereafter began to chase him around the North side of the building. As he was pursuing the deceased, William Washington came out the North door of the club and began chasing Foster and firing his own weapon. Defendant then related that Foster ran to the next corner of the building with Washington in pursuit and the defendant heard two (2) shots fired before he made it around the corner and found Foster lying on the ground. The defendant further testified that he fired only four (4) shots, all in the air, and thought that his revolver only had four (4) bullets in it. He further stated that all four (4) of his shots were fired prior to the time William Washington joined in the chase. He and Washington thereafter left the scene and went to the home of Delores Sutton. During the course of the trip to Ms. Sutton's home Washington bragged about shooting Foster. After arriving at Ms. Sutton's house both men gave their guns to her for safe keeping.

The final witness for the defense was Delores Sutton who stated that she was acquainted with the defendant and William Washington and that both men had come to her house in the early morning hours of June 5, 1974. She further stated that Washington told her he had just killed "a nigger". Both men had pistols, the defendant a .38 caliber revolver and Washington a .22 caliber revolver. She further stated

she kept both pistols and put them in a kitchen drawer but that Washington came back later that night and retrieved his pistol. The defense then rested.

■ The defendant's first assignment of error contends that certain remarks made by the prosecutor during closing arguments were so prejudicial that reversible error was committed. Reviewing the four (4) specific comments complained of, it appears from the record that in two instances the defense counsel, although he objected, failed to request that the trial court admonish the jury and failed to move for a new trial. On numerous occasions this Court has held that if counsel wishes to preserve his record during closing argument when an objectionable statement is made by the prosecuting attorney, it should be called to the attention of the trial court by timely objection together with the request that the jury be instructed to disregard the improper statement, and in the event that the objection is overruled, an exception should be taken to the ruling of the trial court, preserved and argued in the motion for new trial. When this is not done the matter cannot be preserved for the first time in the motion for new trial and in the petition in error and briefs on appeal. See *Overstreet v. State*, Okl.Cr., 483 P.2d 738.

■ The other comments complained of were objected to, an admonishment requested and the trial court admonished the jury pursuant to the request. As stated in *Warner v. State*, Okl.Cr., 489 P.2d 526, when the trial court properly admonishes the jury to disregard a remark and the remark objected to does not constitute a fundamental error, a reversal on appeal will not lie. In the instant case it is our opinion that neither comment constitutes fundamental error. Therefore, the defendant's first assignment of error is without merit.

■ The defendant's final assignment of error contends that the trial court erred in failing to submit manslaughter instructions to the jury. We must disagree. In

*Harrison v. State,* Okl.Cr., 461 P.2d 1007, this Court citing *Newby v. State,* 17 Okl. Cr. 291, 188 P. 124, and *Sayers et al. v. State,* 10 Okl.Cr. 233, 135 P. 1073, held that when a defendant, who has a right of election as to several defenses, takes the stand as a witness and makes such admissions as to render every theory of defense unavailable save one, he will be deemed to have elected that one.

In the instant case the defense was that defendant did not fire at the victim but shot in the air, and that the fatal shot was in fact fired by one William Washington. The defendant was either innocent or guilty of Murder in the Second Degree and the trial court committed no error in failing to submit a manslaughter instruction to the jury. The defendant's last assignment of error is without merit.

From an examination of the record as a whole, it is apparent to this Court that the defendant received a fair and impartial trial before a jury. No fundamental right of the defendant was prejudiced and the judgment and sentence appealed from should be, and the same is hereby *AFFIRMED.*

BRETT, P. J., and BUSSEY, J., concur.